**Electronically Filed
Supreme Court
SCAP-17-0000816
21-JAN-2020
08:11 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

———————————————————————————————————

IN THE MATTER OF THE TAX APPEAL OF KAHEAWA WIND POWER, LLC,
Respondent/Taxpayer-Appellant-Appellee,

vs.

COUNTY OF MAUI,
Petitioner/Appellee-Appellant.

————————————————————————————————

IN THE MATTER OF THE TAX APPEAL OF AUWAHI WIND ENERGY LLC,
Respondent/Taxpayer-Appellant-Appellee,

vs.

COUNTY OF MAUI,
Petitioner/Appellee-Appellant.

———————————————————————————————————

SCAP-17-0000816

APPEAL FROM THE TAX APPEAL COURT
(CAAP-17-0000816 and CONSOLIDATED CASES: CAAP-17-0000817,
CAAP-17-0000818, CAAP-17-0000819, and CAAP-17-0000820;
T.X. No. 14-1-0266 AND CONSOLIDATED CASE T.X. No. 16-1-0272;
T.X. No. 14-1-0267 AND CONSOLIDATED CASE T.X. No. 16-1-0273;
and T.X. Nos. 16-1-0275, 15-1-0238, and 16-1-0328)

JANUARY 21, 2020

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY RECKTENWALD, C.J.

## I. INTRODUCTION

This case arises from a taxation dispute between Appellant County of Maui (County) and Appellees Kaheawa Wind Power, LLC, Kaheawa Wind Power II, LLC (collectively, Kaheawa), and Auwahi Wind Energy LLC (Auwahi), which lease land on the island of Maui in order to operate their wind farms.[1] At issue is whether the County had the authority, under article VIII, section 3 of the Hawai'i Constitution, to include the value of Appellees' wind turbines in Appellees' real property tax assessments, and to redefine the term "real property" within section 3.48.005 of the Maui County Code (MCC) to include wind turbines for that purpose.

Appellees challenged the County's actions in the Tax Appeal Court (TAC), which issued summary judgment orders and a final judgment in their favor. The TAC held that the County, by amending the MCC, exceeded its authority under article VIII, section 3 because the delegates to the 1978 Constitutional Convention did not intend to grant the counties the power to redefine "personal property" as "real property." In response,

----

[1] Kaheawa and Auwahi operate their wind farms on land leased from the State of Hawai'i and Ulupalakua Ranch, Inc., respectively.

the County filed five separate appeals with the ICA (consolidated under CAAP-17-816) and filed an application for transfer, which this court granted.

We hold that the County exceeded its constitutional authority by amending MCC § 3.48.005 to expand its definition of "real property" to include "personal property," and agree with the TAC that the delegates to the 1978 Constitutional Convention did not intend to grant the counties the power to define the term. We further hold that the delegates intended for this power to be reserved to the legislature. As such, we uphold the TAC's final judgment in favor of Appellees.

## II.  BACKGROUND

To understand the issues at the heart of this case, we first explain the proceedings of the 1978 Constitutional Convention, the County's initial enactment of MCC § 3.48.005 (1980), and the ICA's 2014 Kaheawa Wind Power, LLC v. County of Maui decision. See 135 Hawai'i 202, 347 P.3d 632 (App. 2014), cert. denied, 2015 WL 745424 (Feb. 19, 2015). We then explain the County's amendment to MCC § 3.48.005 (2013), the TAC's rationale for granting summary judgment for the Appellees, and the parties' positions on appeal to this court.

## A.  Article VIII, Section 3

Article VIII, section 3 of the Hawai'i Constitution took effect in 1981, pursuant to its adoption by the 1978 Constitutional Convention and subsequent ratification by the

3

voters.  Since 1981, it has provided:

> The taxing power shall be reserved to the State,
> except so much thereof as may be delegated by the
> legislature to the political subdivisions, and except
> that <u>all functions, powers and duties relating to the
> taxation of real property shall be exercised
> exclusively by the counties</u>, with the exception of the
> county of Kalawao.  The legislature shall have the
> power to apportion state revenues among the several
> political subdivisions.

(emphasis added).

This language as ultimately adopted is similar to the language of article VIII, section 3 as originally proposed, except that the originally proposed language only granted the counties the "power to levy a tax on real property."  Stand. Comm. Rep. No. 42 in 1 Proceedings of the Constitutional Convention of Hawai'i of 1978, at 594 (1980).  Prior to the amendment's adoption, "all taxation authority was unequivocally vested in the State."  <u>See</u> <u>State ex rel. Anzai v. City & Cty. of Honolulu</u>, 99 Hawai'i 508, 510, 57 P.3d 433, 435 (2002) (citing Haw. Const. art. VII, § 3 (1968)).[2]

The Standing Committee on Local Government was the first Committee to consider section 3's proposed language and the extent of the taxation authority to grant the counties.  <u>See</u> <u>id.</u>

---

[2]    Article VII, section 3 of the 1968 Hawai'i Constitution provided:

> The taxing power shall be reserved to the State except
> so much thereof as may be delegated by the legislature
> to the political subdivisions, and the legislature
> shall have the power to apportion state revenues among
> the several political subdivisions.

In Report No. 42, the Committee recommended that the counties be given the "power to levy a tax on real property." Id. at 521. In relevant part, Report No. 42 contained the following discussion:

> Your Committee finds that the question of a centralized real property tax program versus a decentralized system has been discussed many times over the past several years.
>
> . . . .
>
> Presently, under the Hawai'i Revised Statutes, the State is responsible for assessing all real property in the State that is subject to the payment of real property taxes, and for levying and collecting all such taxes, and adjudicating taxpayer appeals. Basic policies defining real property, setting the basis of assessment, determining the manner in which rates are set, setting exemptions and describing the appeals process are the responsibility of state lawmakers.
>
> . . . .
>
> In recent years, county officials have advocated the transfer of real property functions from the State to the counties. Such a move, it is felt, would permit counties to use the power to tax real property in a more effective manner. A general grant of taxing powers to the counties would include: a) assessments of property, b) adjudications of appeals, c) levying of tax rates, d) collections of taxes and e) formulation of basic policies.
>
> . . . .
>
> Your Committee concludes that the power to levy a tax on real property should be granted to the County for the following reasons:
>
> > 1) County governments are completely responsible and accountable for the administration of their local affairs. It is felt that in order to have complete authority over their county finances the

5

> real property tax function should be given to the counties.
>
> 2)  By placing total responsibility for the real property tax program with the counties, public confusion as to who or which level of government is responsible for the real property tax bite would be eliminated.
>
> 3)  County administration of the real property tax is consistent with home rule.
>
> 4)  There are certain program elements which do not invoke issues of statewide concern and/or which do not lend themselves to single, statewide solutions.  In other words, there are different economic bases and needs of the counties which cannot be addressed by statewide real property provisions.
>
> Your Committee also considered granting the counties the power to levy a general excise tax . . . .
>
> . . . .
>
> Your Committee acknowledges the desire of the counties for greater autonomy, self-reliance and financial independence.  Although the general excise tax looks like an attractive way for counties to raise revenues, your Committee finds that one should keep in mind the issue of fairness to taxpayers[.]
>
> Your Committee is in accord with the conclusion reached by Mr. Fred Bennion of the Tax Foundation of Hawai'i who states:
>
> The counties, should they desire additional revenues, have the power to raise the added revenue through the real property tax by increasing the rates[.]

Comm. of the Whole Debates in 2 Proceedings of the Constitutional Convention of Hawai'i of 1978, at 594–95 (1980).

The floor debates on the amendment took place next, where, notably, Delegate Souki and Delegate Crozier voiced their concerns over the proposed amendment's language. Comm. of the Whole Debates in 2 Proceedings of the Constitutional Convention of Hawai'i of 1978, at 258-59 (1980). Delegate Souki, for instance, explained that "the intent of the section providing for the exclusive power of real property taxation [was] not so that the counties [could] increase their revenue or increase their taxing powers," but rather, "to provide for better management of the taxing power" and "more accountability." Id. Similarly, Delegate Crozier explained that "while [he was] kind of for the counties get[ting] control of [real property taxation]," he was also "kind of afraid of a council that [might] lean[] one special way" in a way that would "advantage . . . select group[s]" while disadvantaging others. Id. at 258.

After the floor debate ended, the Committee of the Whole convened and issued Report No. 7, which recommended adopting the language found in article VIII, section 3 today. Comm. as a Whole Rep. No. 7 in 1 Proceedings of the Constitutional Convention of Hawai'i of 1978, at 1008 (1980). In relevant part, Report No. 7 explained its recommendation to change the "tax levying" language to the broader "all functions, powers and duties" language "to clarify the Standing Committee's intent to grant all taxing powers relating to real property to the counties, except Kalawao." Id. Report No. 7 continued:

7

> [T]here was some question under the earlier ["tax levying"] language as to whether or not the counties would have the power to set exemptions.  Although the mover of this amendment explained that 'the power to levy' did include the lesser power of setting exemptions, this amendment was adopted as having the better language.

Id.

The Report further explained that the Committee of the Whole was "reject[ing] an amendment to grant the counties [the] power to levy a general excise tax," in light of delegates' concerns that it would "add[] taxes to the same people and would therefore be unfair."  Id.

As such, article VIII, section 3 of the Hawai'i Constitution was enacted, giving the counties exclusive authority over "all functions, powers and duties relating to the taxation of real property."  Haw. Const. art. VIII, § 3.  At the time of the amendment's adoption, and still, today, the constitution had not defined the term "real property."

To facilitate the transition of real property tax power from the State to the counties, the delegates of the Constitutional Convention also adopted article XVIII, section 6, which explained:

> The amendment to Section 3 of Article VIII shall take effect on the first day of July after two full calendar years have elapsed following the ratification of such amendment [November 7, 1978]; provided that for a period of eleven years following such ratification, the policies and methods of assessing real property taxes shall be uniform throughout the State and shall be established by agreement of a majority of the political subdivisions.  Each

8

> political subdivision shall enact such uniform
> policies and methods of assessment by ordinance before
> the effective date of this amendment [July 1, 1981],
> and in the event the political subdivisions fail to
> enact such ordinances, the uniform policies and
> methods of assessment shall be established by general
> law. . . .

Haw. Const. art. XVIII, § 6.

## B.    MCC § 3.48.005's Enactment (1980)

In accordance with article XVIII, section 6, and to provide a framework for the required transition, the legislature enacted HRS chapter 246A in 1980 to take the place of chapter 246, the State's real property tax code.[3]  In adopting their respective property tax ordinances, all the counties, with the exception of Kalawao, borrowed the statutory language of chapter 246, including the language from HRS § 246-1 (1967), which provided the following definition of "real property":

> "Property" or "real property" means and includes all
> land and appurtenances thereof and the buildings,
> structures, fences, and improvements erected on or
> affixed to the same, and any fixture which is erected
> on or affixed to such land, buildings, structures,
> fences, and improvements, including all machinery and
> other mechanical or other allied equipment and the
> foundations thereof, whose use thereof is necessary to
> the utility of such land, buildings, structures,
> fences, and improvements, or whose removal therefrom
> cannot be accomplished without substantial damage to
> such land, buildings, structures, fences, and
> improvements, excluding, however, any growing crops.

---

[3]    Both of these chapters were repealed in 2016 "for the purpose of deleting obsolete and unnecessary provisions."  See H.B. No. 2217, H.D. 1, S.D. 1.

Thus, when the County of Maui enacted MCC § 3.48.005 in 1980, it provided:[4]

> "Property" or "real property" means and includes all land and appurtenances thereof and the buildings, structures, fences, and improvements erected on or affixed to the same, and any fixture which is erected on or affixed to such land, buildings ~~structures~~ structures, ~~structures~~, fences, and improvements, including all machinery and other mechanical or other allied equipment and the foundations thereof, whose use thereof is necessary to the utility of such land, buildings, structures, fences, and improvements, or whose removal therefrom cannot be accomplished without substantial damage to such land, buildings, structures, fences, and improvements, excluding, however, any growing crops.

This definition of "real property" for taxation purposes remained the same for over thirty years, until 2013 after Kaheawa challenged the County's authority under the MCC to include the value of its wind turbines within its real property tax assessments for the 2007-2011 tax years.[5]  Kaheawa, 135 Hawai'i at 204, 347 P.3d at 634.

---

[4]     The County concedes that the ordinance's language tracked the language of HRS § 246-1 (1967).  The stricken and underlined text represents the ways in which the language of MCC § 3.48.005 (1980) differed from the language of HRS § 246-1 (1967).  The stricken text represents the text of HRS § 246-1 that was omitted in the County's ordinance, while the underlined text represents what was added.

[5]     Auwahi was not a party to the Kaheawa litigation.  However, after the ICA's Kaheawa decision, Auwahi entered into a stipulated final judgment with the County that Auwahi's wind turbines were not "real property" under MCC § 3.48.005 (1980) for the 2013 tax year.  As discussed below, after the County amended the definition of "real property" in the MCC, it again classified Auwahi's wind turbines as real property for tax years 2014 onward.

10

## C.    The ICA's <u>Kaheawa</u> Decision

In the litigation that followed, the ICA affirmed the TAC's grant of summary judgment to Kaheawa, and held in a published opinion that wind turbines did not qualify as "real property" under the definition provided in MCC § 3.48.005.  <u>Id.</u>

To constitute "real property" under the MCC, the ICA explained that the wind turbines would, as a threshold matter, need to qualify either as "improvements" or "fixtures."  <u>Id.</u> at 207, 347 P.3d at 637.  The ICA first held that the wind turbines did not qualify as "improvements."  <u>Id.</u> at 208-09, 347 P.3d at 638-39.  The ICA explained:

> The County urges this court to apply the Black's Law Dictionary definition [of 'improvement'], which defines 'improvement' as '[a]n addition to real property, whether permanent or not; esp., one that increases its value or utility or that enhances its appearance."  <u>Black's Law Dictionary</u> 826 (9th ed. 2009).  Considering the particular issue before us, we disagree that the broad definition of 'improvement' advanced by the County applies to the wind turbines in this case.
>
> As recognized in the parties' stipulation,[6] Kaheawa asserts that the wind turbines are equipment and machinery.  The County [] also expressly recognizes that '[t]he turbines are plainly <u>machinery</u>.' []  In MCC § 3.48.005, certain types of 'machinery' are incorporated as part of the description of a 'fixture.'
>
> . . . .

---

[6]    The County and Kaheawa signed a Stipulation of Facts regarding the <u>Kaheawa</u> litigation (CAAP-12-728), which provided that the Stipulation was "made solely for purposes of the present action" and did not "constitute an admission of any fact for any other purpose or with respect to any third party."

> If the County's broad interpretation of an improvement
> was applied to this case, the language in MCC
> § 3.48.005 related to fixtures and machinery would be
> rendered meaningless.

Id.

Second, the ICA held that the wind turbines did not qualify as "fixtures." Id. at 209-211, 347 P.3d at 639-641. To qualify as a "fixture" under the MCC's definition of "real property," the ICA explained that it would either have to find that "(1) the use of the wind turbines [would be] necessary to the utility of the land . . . . ; or [] (2) the removal of the wind turbines [could not] be accomplished without substantial damage to the land[.]" Id. at 209-10, 347 P.3d at 639-40 (emphases added). Because the parties had stipulated that Kaheawa's wind turbines could be removed without substantially damaging the land, the ICA focused on whether the land could be utilized without the wind turbines' use. Id. Noting that the MCC did not clarify whether the term "utility" meant (1) general utility or (2) utility specific to a particular business or use, the ICA looked to the "traditional common law" analysis regarding "fixtures" for guidance, and in particular, its "adaptation" element. Id. at 210, 347 P.3d at 640. The analysis was as follows:

> The traditional common law test for determining
> whether an item of personal property has become a
> 'fixture' requires three elements: (1) the actual or
> constructive annexation of the article to the realty,
> (2) the adaptation of the article to the use or
> purpose of that part of the realty with which it is

12

> connected, and (3) the intention of the party making
> the annexation to make the article a permanent
> accession to the freehold.

Id. (citing 35 Am.Jur.2d Fixtures § 4 and Cartwright v. Widemann, 9 Haw. 685, 690-91 (Haw. Kingdom 1892), superseded on other grounds, RLH § 8871 (1945), as recognized in Hess v. Paulo, 38 Haw. 279 (Haw. Terr. 1949)) (emphasis added).

While acknowledging that jurisdictions varied in their interpretation of the test's "adaptation" element,[7] the ICA applied the analysis set forth in Zangerle v. Republic Steel Corp., 60 N.E.2d 170 (Ohio 1945), given its consistency with Cartwright v. Widemann,[8] which the ICA described as the "only

---

[7]     The ICA did not cite to any cases demonstrating how different jurisdictions treated the "adaptation" prong of the common law fixture test. We note, however, that while the Ohio Supreme Court in Zangerle only considered an article a "fixture" if, under the "adaptability" prong of the test, the article was useful to the inherent utility of the land, other courts, such as the Supreme Court of New Hampshire considered an article a "fixture" if the article was "intimately intertwined with the primary use of the land itself," or in other words, the use to which the land was being put. See, e.g., King Ridge, Inc. v. Town of Sutton, 340 A.2d 106, 110 (N.H. 1975) (holding that ski lifts were taxable as real property, in part, because the hills upon which they were located were "specially cleared and graded for downhill skiing").

[8]     The ICA explained:

> In Cartwright, the Supreme Court of the Kingdom of
> Hawai'i held that machinery used as part of an iron
> works company (including lathes, an emery wheel, a
> drill press, a milling machine, a shaping machine and
> a grinding machine), most of which were fastened to
> the flooring of a building or overhead, were not
> fixtures.  9 Haw. at 688-89.  Significantly, the court
> also stated that "movable machines, whose number and
> permanency are contingent upon the varying conditions
> of the business differ from engines and boilers and
> other articles secured by masonry and designed to be
> permanent and indispensable to the enjoyment of the
> freehold."

(continued...)

13

Hawai'i case" to touch upon the issue.  Id. at 210-11, 347 P.3d

at 640-41.  The ICA explained:

> In Zangerle, a company that operated steel plants
> challenged the tax assessment of machinery and
> equipment as improvements on the land rather than as
> personal property.  [] 60 N.E.2d at 173.  Addressing
> the second part of the traditional fixture test, the
> Ohio Supreme Court relied on the following:
>
> > The general principle to be kept in view,
> > underlying all questions of this kind, is the
> > distinction between the business which is
> > carried on in or upon the premises, and the
> > premises, or locus in quo.  The former is
> > personal in its nature, and articles that are
> > merely accessory to the business, and have been
> > put on the premises for this purpose, and not as
> > accessions to the real estate, retain the
> > personal character of the principal to which
> > they appropriately belong and are subservient.
> > But articles which have been annexed to the
> > premises as accessory to it, whatever business
> > may be carried on upon it, and not particularly
> > for the benefit of a present business which may
> > be of a temporary duration, become subservient
> > to the realty and acquire and retain its legal
> > character.

Id. (citing Zangerle, 60 N.E.2d at 177) (emphases added).

Finding that Kaheawa's wind turbines were "only

necessary to the utility of the land . . . given the particular

business [that] Kaheawa currently operat[ed]," – i.e., the

business of producing wind energy – the ICA held that the wind

turbines could not satisfy the "adaptation" element of the

"utility" prong of the fixture test.  Id. at 209-11, 347 P.3d at

_____

(...continued)
    Kaheawa, 135 Hawai'i at 211, 347 P.3d at 641 (citing Cartwright, 9 Haw.
    at 688-89).

14

639-41.  Accordingly, the wind turbines could not be considered "fixtures," and therefore, could not constitute "real property" under the MCC.  Id.

In 2015, the County filed an application for writ of certiorari challenging the ICA's holding that Kaheawa's wind turbines were not "improvements," and further, its reliance on Zangerle in interpreting what constituted a common law "fixture." See SCWC-12-728.  This court rejected that application.  See 2015 WL 745424 (Feb. 19, 2015).

## D.    The County's 2013 Amendment to MCC § 3.48.005

In response to the litigation described above, the County amended MCC § 3.48.005 in 2013 to include wind turbines, or other articles that would "increase the value" of the underlying realty, within its definition of "real property."  As amended, and as it reads today, MCC § 3.48.005 provides:[9]

> "Property" or "real property" means and includes all land and appurtenances thereof and the building structuress, fences, and improvements erected on or affixed to the same,; and any fixture which is erected on or affixed to such land, buildings, structures, fences, and improvements, including all machinery and other mechanical or other allied equipment and the foundations thereof, whose use thereof is necessary to the utility of such land, buildings, structures, fences, and improvements, or whose removal therefrom cannot be accomplished without substantial damage to such land, buildings, structures, fences, and improvements, excluding, however, any growing crops.

---

[9]    The stricken and underlined text represents the ways in which the language of MCC § 3.48.005 (2013) differed from its original language.  The stricken text represents the text of MCC § 3.48.005 (1980) that was omitted in the amendment, while the underlined text represents what was added.

15

1.  Whose use thereof increases the value to, or is necessary to the utility of such land, buildings, structures, fences, and improvements; or

2.  Whose removal therefrom cannot be accomplished without substantial damage to such land, buildings, structures, fences, and improvements, excluding, however, any growing crops; or

3.  Any and all wind energy conversion property that is used to convert wind energy to a form of usable energy, including, but not limited to, a wind charger, windmill, wind turbine, tower and electrical equipment, pad mount transformers, power lines, and substation, and other such components.

(2013).

In essence, through the changes to the ordinance, the County redefined "real property" to include wind turbines, and also allowed any article whose use "increases the value to, or is necessary to the utility" of the land to become an assessable accession to realty for the purposes of real property taxation.[10]

Under its new authority from the amended code, the County again began including the value of Kaheawa's and Auwahi's wind turbines within their real property tax assessments for the 2014, 2015, and 2016 tax years.

The Appellees thus challenged the County's actions, arguing this time that the County exceeded its authority under

---

[10] Notably, by allowing any article whose use "increases the value to, or is necessary to the utility" of the land to become an assessable accession to realty, the County seemed to adopt the broad interpretation of "improvement" that it had unsuccessfully advocated for in Kaheawa. See Kaheawa, 135 at 208-09, 347 P.3d at 638-39.

article VIII, section 3 of the Hawai'i Constitution by expanding the definition of "real property" to include "personal property."

**E.    The TAC's Grant of Summary Judgment to Appellees**

The TAC granted Kaheawa and Auwahi's motions for summary judgment and issued final judgments in their favor after finding that the delegates to the 1978 Constitutional Convention had never intended to grant the counties the power to redefine the term "real property" to include "personal property."[11]

To reach its conclusion, the TAC emphasized the language of the Committee on Local Government and Committee of the Whole's reports, as well as Delegate Souki and Crozier's comments on the floor.  In its oral ruling for the Appellees, the TAC explained:

> [W]hen we look at the language of the Constitutional Convention Amendment and its reference to taxation of real property, the Court finds . . . that the Constitutional Convention in 1978 had no intention to confer the power of policymaking to the extent that the counties [could] redefine the term "real property" to include chattel which are personal property because that is a matter of policy.
>
> And if the counties of [Hawai'i] have the power to redefine real property so broadly as to include chattel, then there may be no end to what the counties will ultimately do with respect to taxing chattel that are located upon real property.  Certainly it is not endless potential, but the potential for including as real property items that were formally chattel on personal property is a matter of great public policy.
>
> . . . .

---

[11]     The Honorable Gary W.B. Chang presided.

17

> [T]he Court is unable to conclude that the
> Constitutional Conventioneers intended to confer onto
> the counties the power to redefine the term "real
> property" to include items of personal property and
> convert those into "real property" and subject those
> items of personal property to real property and
> subject to real property taxation.

## F.    The Instant Appeal

Upon the TAC's written final judgments in favor of Kaheawa and Auwahi,[12] the County filed five appeals with the ICA (consolidated under CAAP-17-816) and filed an application for transfer, which this court granted.

The County contends that article VIII, section 3 transferred the power to define "real property" to the counties, and that accordingly, the County had the power to (a) add wind turbines to its definition of "real property," and (b) adopt its own test, based on appraisal concepts of use, utility, and value, to potentially tax any type of property that satisfied the test as assessable accessions to realty.

To its first point, the County contends that article VIII, section 3 provided a general grant of authority to the counties over the "functions, powers and duties" related to the taxation of real property, and that this general grant necessarily gave the counties the authority to define "real property."

---

[12]     See Final Judgment in favor of Kaheawa for Tax Years 2014 and 2015 (October 4, 2017) in CAAP-17-816, JEFS Dkt. 1:7-10 and CAAP-17-817, JEFS Dkt. 1:1-7; Final Judgment in Favor of Auwahi for Tax Year 2015 in CAAP-17-818, JEFS Dkt. 1; Final Judgment in Favor of Auwahi for Tax Year 2014 in CAAP-17-819, JEFS Dkt. 1; and Final Judgment in Favor of Auwahi for Tax Year 2016 in CAAP-17-820, JEFS Dkt. 1.

Citing to Report No. 42 by the Committee on Local Government for support, the County notes the Committee's statements that in 1978, "pursuant to the [HRS], the 'real property tax program' including "basic policies defining real property" . . . [was] the responsibility of state lawmakers"; that the State had the ability to "utilize the real property tax as an instrument of land use and economic policy"; and that "a general grant of authority to the counties [of the power to tax real property] would include . . . [the] formulation of basic policies."  In light of these acknowledgments, the County argues that the Committee of the Whole would not have adopted the broad "functions, powers and duties" language that it did over the more narrow "tax levying" language it had considered, had it not meant to provide the counties with a general grant of authority.

The County further refers to Gardens at West Maui v. County of Maui, whereby, the County contends, this court was "unambiguous" in its recognition that article VIII, section 3 provided the counties with a general grant of authority over real property policymaking functions.[13]  See 90 Hawai'i 334, 978 P.2d 772, 779 (1999) ("The constitutional and legislative acts [including article VIII, section 3] covered the whole subject of property taxation power and embraced the entire law in that regard.").

---

[13]   In its answering brief, Auwahi argues that the Gardens at West Maui case is inapposite, because this case only recognized the counties' grant to tax real property.

19

In light of the amendment's legislative proceedings and Gardens at West Maui, the County contends that article VIII, section 3 explicitly gave the County the authority to define "real property."  As such, and in accord with the laws of other jurisdictions, the County contends it had the authority to amend MCC § 3.48.005 to redefine "real property" to include wind turbines, and to rely on appraisal concepts of use, utility, and value to further classify which articles of property could become assessable accessions to realty.  See, e.g., King Ridge, Inc. v. Town of Sutton, 340 A.2d 106 (N.H. 1975) and Opinion of the Justices, 697 A.2d 125 (N.H. 1997)).[14]

Because the County argues that article VIII, section 3 granted the counties the power to define "real property," and because it contends that neither the common law nor the statutory scheme in Hawai'i defined the "personal property" that could only be taxed by the State, it contends that any reliance in this jurisdiction on Zangerle to define "real property" is misplaced.

On the one hand, the County contends that the ICA's Kaheawa decision has no effect on the current lawsuit because that decision only held that wind turbines could not be

---

[14]    In King Ridge, Inc., the New Hampshire Supreme Court held that the legislature had the power to make any type of property realty for taxation purposes, even if that property was personalty at common law.  340 A.2d at 109-10.  In Opinion of the Justices, the same court again recognized the legislature's power to make any kind of property realty for purposes of taxation, and further, explained that the legislature could validly subject to taxation certain instruments of production or machines, which by their nature were designed for use in connection with real estate, regardless of whether they were part of or attached to realty.  697 A.2d at 107.

considered "real property" under the County's previous version of MCC § 3.48.005.  Because the County contends that it resolved any confusion over whether wind turbines could be considered "real property" under the amended version of the code, pursuant to its constitutional authority to redefine "real property," it argues that there is no inconsistency between the Kaheawa decision and the County's actions now.

On the other hand, the County continues to challenge the ICA's reliance on Zangerle to inform its analysis of what constituted a "fixture" at common law.  Specifically, the County contends that Zangerle cannot control in Hawaiʻi given: (1) the "significant variance in the traditional common law test of fixtures across [] jurisdictions[;]" (2) the differences between Ohio and Hawaii's statutory and constitutional schemes and the Supreme Court of Ohio's "consistent" repudiation of the test; (3) the test's limited applicability to fixtures as applied to electric power generation facilities; and (4) the test's "vague" concept of "general inherent utility."

Ultimately, the County argues that this court should abandon the ICA's recognition of Zangerle's "fixture" test, which it claims erroneously characterizes an article's "utility" as an article's "general utility" to realty.  The County advocates that we should now recognize an article's "utility" as that use for which the land is currently being put, because "it is difficult

21

to understand what its 'general inherent utility' could possibly be, except for perhaps the value in owning and possessing it."

The County further argues that the Appellees' wind turbines constitute "real property" because they are permanent and their removal would cause material injury to the land.[15]  For permanency, the County contends that "to determine the excludability of personal property from being taxed as realty" for the common law fixture test, the test should be "whether property installed similar to the [article at issue] is not 'ordinarily' intended to be affixed permanently to real property" and should not be based on a party's intent of permanency.[16]  If this were the test, the County contends, then by "all reasonably manifested outward appearances[,] [the Appellees'] wind turbine generators" would be considered permanent.

In summary, the County urges this court to hold that the Hawai'i Constitution provided the counties with the authority

---

[15]    This is inconsistent with the stipulated facts from Kaheawa, whereby all parties agreed that Kaheawa's wind turbines and towers could be "unbolted and removed without any harm to either the equipment or the land." See Kaheawa, 135 Hawai'i at 204, 347 P.3d at 640.

[16]    See, e.g., NYT Cable TV v. Audubon Borough, 9 N.J. Tax 359, 369 (1987) ("To determine the excludability of personal property from being taxed as realty, the test is not what plaintiffs actually intended as to its permanency, but whether property installed similar to the subject tower is not 'ordinarily' intended to be affixed permanently to real property."); American Hydro Power Partners, L.P. v. Clifton City, 12 N.J. Tax 264, 269 (1991) ("the improvements should be taxed as real property because plaintiff failed to establish, by a preponderance of the evidence, that the equipment was not 'ordinarily intended to be affixed permanently to the real property[.]"); Guardian Energy LLC v. Cty. of Waseca, 868 N.W.2d 253, 260 (2015) (rejecting contention that tanks were not "permanently affixed" to the land because they could theoretically be removed by detaching them from their foundations or by towing them away).

22

to define "real property" for taxation purposes, and thus uphold its 2013 amendment to the MCC.  In the alternative, however, the County explains that under the proper interpretations of utility and permanence, wind turbines do constitute real property, even under the common law fixture test.

The Appellees, as well as Tax Foundation of Hawai'i (Tax Foundation) as amicus curiae, argue that the County exceeded its authority under the Constitution when it expanded the definition of real property beyond what it was commonly understood as in 1978.  As such, they argue that MCC § 3.48.005 as amended is ultra vires, and that the ICA's Kaheawa decision appropriately applied Zangerle's fixture test to conclude that wind turbines could not be "real property."  Additionally, the parties argue that permitting the County to tax wind turbines as part of its real property scheme would both frustrate Hawaii's renewable energy policy goals, and contravene federal and state taxation policy.[17]

_____

[17] For instance, Kaheawa and Tax Foundation argue that at the federal level, the IRS has treated wind turbines as tangible personal property for energy credit and depreciation purposes (citing IRC §§ 48(a)(3), 168(e)(3)(B)(vi); IRS Private Letter Ruling 9007042 (1989) (credit allowed for wind turbines under IRC section saying that eligible property includes tangible personal property and other tangible property except a building and its structural components)).  And, at the State level, both Appellees note that they qualify for a Capital Goods Excise Tax Credit under HRS § 235-110.7(3) with respect to their wind turbines, and that this credit is limited to "tangible personal property" which does not include "property . . . integral [to] a building or structure."

Last, Kaheawa notes the State of Hawaii's energy policy to move away from fossil fuels.  Kaheawa cites to HRS § 269-92, which "set[s] a goal of one hundred per cent renewable [energy] by 2045[,]" as well as Governor Ige's and state agencies' commitments to "move more decisively and irreversibly away from imported fossil fuel for electricity and transportation

(continued...)

## III.   STANDARDS OF REVIEW

### A.   Summary Judgment

"Unlike other appellate matters, in reviewing summary judgment decisions an appellate court steps into the shoes of the trial court and applies the same legal standard as the trial court applied." Beamer v. Nishiki, 66 Haw. 572, 577, 670 P.2d 1264, 1270 (1983) (internal quotation omitted). As such, when reviewing questions of law from summary judgment orders in the TAC, we review those questions under the right/wrong standard. Maile Sky Court Co. v. City & Cty. of Honolulu, 85 Hawai'i 36, 39, 936 P.2d 672, 675 (1997) (citation omitted).

### B.   Constitutional Interpretation

"Issues of constitutional interpretation present questions of law that are reviewed de novo." Blair v. Harris, 98 Hawai'i 176, 178, 45 P.3d 798, 800 (2002) (citation omitted). In construing the constitution, the appellate court observes the following basic principles:

> Because constitutions derive their power and authority from the people who draft and adopt them, we have long recognized that the Hawai'i Constitution must be construed with due regard to the intent of the framers and the people adopting it, and the fundamental principle in interpreting a constitutional provision is to give effect to that intent. This intent is to be found in the instrument itself.
>
> [T]he general rule is that, if the words used in a constitutional provision are clear and unambiguous,

---

[17](...continued)
and towards indigenously produced renewable energy and an ethic of energy efficiency."

24

> they are to be construed as they are written.  In this
> regard, the settled rule is that in the construction
> of a constitutional provision the words are presumed
> to be used in their natural sense unless the context
> furnishes some ground to control, qualify, or enlarge
> them.
>
> Moreover, a constitutional provision must be construed
> in connection with other provisions of the instrument,
> and also in the light of the circumstances under which
> it was adopted and the history which preceded it.

Hanabusa v. Lingle, 105 Hawai'i 28, 31-32, 93 P.3d 670, 673-74

(2004) (brackets in original) (quotation omitted).

C.    **Statutory Interpretation**

"Statutory interpretation is a question of law

reviewable de novo."  State v. Wheeler, 121 Hawai'i 383, 390, 219

P.3d 1170, 1177 (2009) (internal quotation marks omitted).  Our

construction of statutes is guided by the following rules:

> It is a cardinal rule of statutory construction that
> the courts are bound, if possible, to give effect to
> all parts of a statute, and no sentence, clause or
> word shall be construed as surplusage if a
> construction can be legitimately found which will give
> force to and preserve all the words of the statute.

In re Ainoa, 60 Haw. 487, 490, 591 P.2d 607, 609 (1978).

> When construing a statute, our foremost obligation is
> to ascertain and give effect to the intention of the
> legislature, which is to be obtained primarily from
> the language contained in the statute itself.  And we
> must read statutory language in the context of the
> entire statute and construe it in a manner consistent
> with its purpose.
>
> When there is doubt, doubleness of meaning, or
> indistinctiveness or uncertainty of an expression used
> in a statute, an ambiguity exists . . . .
>
> In construing an ambiguous statute, "[t]he meaning of
> the ambiguous words may be sought by examining the

25

> context, with which the ambiguous words, phrases, and
> sentences may be compared, in order to ascertain their
> true meaning." HRS § 1-15(1) [(1993)]. Moreover, the
> courts may resort to extrinsic aids in determining
> legislative intent. One avenue is the use of
> legislative history as an interpretive tool.
>
> Gray [v. Admin. Dir. of the Court], 84 Hawai'i [138,]
> 148, 931 P.2d [580,] 590 [(1997)] (quoting State v.
> Toyomura, 80 Hawai'i 8, 18-19, 904 P.2d 893, 903-04
> (1995)) (brackets and ellipsis points in original)
> (footnote omitted). The appellate court may also
> consider "[t]he reason and spirit of the law, and the
> cause which induced the legislature to enact it . . .
> to discover its true meaning." HRS § 1-15(2). . . .
> "Laws in pari materia, or upon the same subject
> matter, shall be construed with reference to each
> other. What is clear in one statute may be called
> upon in aid to explain what is doubtful in another."
> HRS § 1-16 (1993).

State v. Koch, 107 Hawai'i 215, 220, 112 P.3d 69, 74 (2005)

[(some brackets added and some in original) (one ellipsis added

and some in original)] (quotation omitted).

Absent an absurd or unjust result, the appellate court

is bound to give effect to the plain meaning of unambiguous

statutory language; we may only resort to the use of legislative

history when interpreting an ambiguous statute. State v.

Valdivia, 95 Hawai'i 465, 472, 24 P.3d 661, 668 (2001).

## IV. DISCUSSION

In prior cases, this court addressed the counties'

broad scope of authority to set property tax policy. We have

acknowledged, for instance, that "[a]rticle VIII, section 3 was

expressly and manifestly designed to transfer to the counties

broad powers of real property taxation," that "the purpose of the

26

amendment was to place the burden of the real property taxation system at the county level," and further, that the amendment, along with the legislative enactments contained in HRS Chapter 246A, which provided for the orderly transfer of property taxation power to the counties, "covered the whole subject [of real property taxation] and embraced the entire law in that regard." Gardens at West Maui, 90 Hawai'i at 341, 978 P.2d at 779.

In Gardens at West Maui, for instance, we recognized that under article VIII, section 3, the counties were free to classify properties and tax them at different rates, despite an earlier statute that would have prohibited such action. Id. at 340, 978 P.2d at 778. And, in Weinberg v. City & County of Honolulu, 82 Hawai'i 317, 324, 922 P.2d 371, 378 (1996), we held that after the statutory period for uniformity in HRS Chapter 246A had lapsed, the counties were no longer bound by the assessment methods the State Department of Taxation had previously imposed – in other words, they were free to set their own methods of assessment.[18] Last, in State ex rel. Anzai v. City & County of Honolulu, 99 Hawai'i 508, 519-21, 57 P.3d 433, 444-45 (2002), we recognized that the counties, pursuant to this

_____

[18] To hold otherwise, we concluded, "would render the provision of [the] eleven-year transition period meaningless because HRS chapter 246, rather than the county ordinances, would continue to govern the policies and methods of assessment." Id.

authority, were free to set and repeal exemptions to the real property tax, as these were clearly "matters of local concern."[19]

Like Gardens, Anzai, and Weinberg, the instant case concerns the scope of the counties' policymaking authority under article VIII, section 3. The County argues that, in particular, Gardens supports its argument that the general grant of authority over real property policy making included the authority to redefine "real property." As such, the County contends it had the authority to amend MCC § 3.48.005 to redefine "real property" and particularly "fixtures" thereon to include machinery or equipment the use of which "increases the value to" the underlying realty, and "property that is used to convert wind energy to a form of usable energy[.]" MCC § 3.48.005 (2013).

"To the extent that the counties, in exercising their exclusive power to tax real property, do not run afoul of the

---

[19] In Anzai, in determining the framers' intent, we referred to the Proceedings of the Constitutional Convention of Hawai'i of 1978. See id. This court noted several instances in the proceedings reflecting "the understanding that the power to tax real property encompassed matters of strictly local concern and that this power included the power to grant or repeal exemptions from real property taxation." Id. One example was from a report from the Standing Committee on Taxation and Finance, which reasoned:

> [T]he power to levy a tax on real property should be granted to the counties because, inter alia, "[c]ounty governments are completely responsible and accountable for the administration of their local affairs" and "[t]here are certain program elements which do not invoke issues of statewide concern and/or which do not lend themselves to single, statewide solutions. In other words, there are different economic bases and needs of the counties which cannot be addressed by statewide real property provisions."

Id. (citing 1 Proceedings of the Constitutional Convention of Hawai'i of 1978, at 594-95 (1980)).

federal or state constitutions, they may act as they see fit."
Anzai, 99 Hawai'i at 517, 57 P.3d at 442.  While we acknowledge
the counties' broad policymaking authority recognized in these
prior cases, however, we cannot conclude in this case that this
authority extends as far as the County claims.

As set forth below, the counties' taxation authority
cannot extend beyond "real property," the definition of which is
currently set by the legislature, nor can it impact any authority
the constitution expressly reserved to the State.  MCC §
3.48.005, as amended in 2013, does both and thus runs afoul of
the state constitution.

**A.    Article VIII, Section 3 Does Not Grant the Counties the
        Power to Define Real Property**

Our court has "long recognized . . . the general rule
. . . that, if the words used in a constitutional provision are
clear and unambiguous, they [must be] construed as they are
written."  Hanabusa, 105 Hawai'i at 31-32, 93 P.3d at 673-74.
The ultimate aim is to give effect to the constitutional
delegates' intent, which can be done by examining "other
provisions of the instrument" and "the circumstances under which
it was adopted and the history which preceded it."  Id.
Moreover, this court has recognized that "tax laws should be
strictly construed and any doubt resolved in favor of the
public."  In re Assessment of Taxes, Commercial Pac. Cable Co.,

16 Haw. 396, 400 (1905) (citing <u>Cooley on Taxation</u>); <u>Narmore v. Kawafuchi</u>, 112 Hawai'i 69, 82, 143 P.3d 1271, 1284 (2006).

### 1. Plain Language

When interpreting a constitutional provision, every word is presumed to have meaning. See <u>Camara v. Agsalud</u>, 67 Hawai'i 212, 215-16, 685 P.2d 794, 797 (1984) ("Courts are bound, if rational and practical, to give effect to all parts of a statute, and [] no . . . word shall be construed as superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all the words of the statute.").

At the time of article VIII, section 3's adoption, the term "real property" had not been defined in the Hawai'i constitution. Despite this, the 1978 constitution still included amendments that distinguished between "real" and "personal" property, thereby implying that there was some inherent difference between the terms.

Article X, section 5, for instance, provided that the University of Hawai'i "shall have title to all the <u>real</u> and <u>personal</u> property now or hereafter set aside or conveyed to it[,]" while sections 5 and 6 of article XII provided that the Office of Hawaiian Affairs and the Board of the Office of Hawaiian Affairs, respectively, would "hold title to all the <u>real</u> and <u>personal</u> property now or hereafter set aside or conveyed to

it" and would "exercise control over <u>real</u> and <u>personal</u>

property[.]" (Emphasis added).

In light of the constitution's recognition of "real"

and "personal" property, the use of the word "real" before

"property" is meaningful. Article VIII, section 3 provides:

> The taxing power shall be reserved to the State,
> except so much thereof as may be delegated by the
> legislature to the political subdivisions, and except
> that <u>all functions, powers and duties relating to the
> taxation of real property shall be exercised
> exclusively by the counties</u>, with the exception of the
> county of Kalawao. The legislature shall have the
> power to apportion state revenues among the several
> political subdivisions.

(Emphasis added).

Had the delegates intended to provide the counties the

authority to tax "personal" property, they presumably would have

done so explicitly. <u>Hanabusa</u>, 105 Hawai'i at 31-32, 93 P.3d at

673-74; <u>Fought & Co.</u>, 87 Hawai'i at 55, 951 P.2d at 505 ("This

court has consistently applied the rule of expressio unius est

exclusio alterius - the express inclusion of a provision in a

statute implies the exclusion of another[.]"). Instead, the

delegates provided that "the taxing power [would] be reserved to

the State . . . except that" the "functions, powers and duties

relating to the taxation of <u>real</u> property" would be granted to

the counties. Art. VIII, § 3.

Thus, a plain reading of article VIII, section 3,

indicates that the counties had only been granted the power to

31

tax "real property" – not to redefine personal property as "real property."

## 2. Legislative Proceedings

An examination of the "circumstances" under which article VIII, section 3 was adopted and the "history which preceded it" supports this conclusion. See Hanabusa, 105 Hawai'i at 31-32, 93 P.3d at 673-74; see also Nelson v. Hawaiian Homes Comm'n, 127 Hawai'i 185, 198, 277 P.3d 279, 292 (2012) ("In order to give effect to the intention of the framers and the people adopting a constitutional provision, an examination of the debates, proceedings and committee reports is useful.") (quoting State v. Kahlbaun, 64 Haw. 197, 204, 638 P.2d 309, 316 (1981)).

We note that the final language of article VIII, section 3 was adopted only after deliberation by the Standing Committee on Local Government, floor debates, and deliberation by the Committee of the Whole.

The Standing Committee on Local Government acknowledged that at the time of the amendment's contemplation, "the State [was] responsible for assessing [] real property [] subject to the payment of real property taxes, [] for levying and collecting [the] taxes upon such property, and [for] adjudicating taxpayer appeals." Stand. Comm. Rep. No. 42 in 1 Proceedings of the Constitutional Convention of Hawai'i of 1978, at 594 (1980). It also acknowledged that the "basic policies defining real property, setting the basis of assessment, determining the manner

32

in which rates [were] set, setting exemptions and describing the appeals process" were the responsibilities of the state's lawmakers.  Id.  The Committee further explained that a "general grant" of the taxing powers to the counties would include property assessments, appeal adjudications, tax levying, collecting taxes, and formulating basic policies.  Id.  Notably, the Standing Committee rejected a proposal to adopt a general excise tax, noting that "should the counties desire additional revenues," the counties should do so through "the real property tax by increasing the rates." (Emphasis added).

Comments during the floor debates suggest that at least two delegates supported only a narrow grant of authority to the counties.  Delegate Souki, for instance, explained that "the intent of the section . . . [was] not so that the counties [could] increase their revenue or increase their taxing powers," while Delegate Crozier explained his concern "of a council that [might] lean[] one special way" to "advantage . . . select group[s]" while disadvantaging others.  Id. Comm. of the Whole Debates in 2 Proceedings of the Constitutional Convention of Hawai'i of 1978, at 264 (1980).

Moreover, although the Committee of the Whole recommended adopting the "all functions, powers and duties" language, as seen in the amendment today, it explained that it was doing so to clarify that "the counties would have the power to set exemptions."  Id. (emphasis added).  And, as the TAC

concluded, nothing was said in the Committee of the Whole's report about a "general grant" of authority to tax personal property.

### 3. The Legislature's Power to Define "Real Property"

Thus, from our analysis above, although it is clear that the delegates to the 1978 Constitution Convention did not intend to grant the counties the power to tax anything more than "real property," it is not clear from the text of the amendment or constitution what the delegates meant by "real property." As such, we may look to "the history of the times and the state of being when [the amendment] was adopted" for guidance. See Nelson, 127 Hawai'i at 198, 277 P.3d at 292 (quoting Kahlbaun, 64 Haw. at 202, 638 P.2d at 315).

Well before article VIII, section 3's adoption, HRS § 246-1 (1967) clearly provided a definition of the term "real property" as related to the subject of real property taxation. Because we presume the delegates were aware of this statute at the time of article VIII, section 3's adoption, and because the delegates took no action to define the term in light of this awareness, we presume that they understood that the power to define, and redefine, the term "real property" rested with the legislature. See Hawai'i State AFL-CIO v. Yoshina, 84 Hawai'i 374, 377, 935 P.2d 89, 97 (1997) (explaining that constitutional delegates are deemed to be aware of common law and statutory principles).

The legislature incorporated the definition of "real property" from HRS § 246-1, which was repealed in 2016, into our current taxation statutes.  See HRS §§ 231-1 and 248-1.  As such, the definition of "real property" that applied to the counties in 1978 still applies to the counties today:

> "Property" or "real property" means and includes all land and appurtenances thereof and the buildings, structures, fences, and improvements erected on or affixed to the same, and any fixture which is erected on or affixed to such land, buildings, structures, fences, and improvements, including all machinery and other mechanical or other allied equipment and the foundations thereof, whose use thereof is necessary to the utility of such land, buildings, structures, fences, and improvements, or whose removal therefrom cannot be accomplished without substantial damage to such land, buildings, structures, fences, and improvements, excluding, however, any growing crops.

HRS §§ 231-1 and 248-1.[20]

### 4.  This Court's Power to Interpret Statutes

The legislative definition of "real property" cites to "fixtures" and "use," but does not define how the "use" prong of the fixture test should be interpreted.  Thus, HRS §§ 231-1 and 248-1 are ambiguous.  It is the task of this court, then, to examine the common law to determine what these terms mean, in the absence of legislative or constitutional guidance.  See Peters v. Weatherwax, 69 Hawaiʻi 21, 27, 731 P.2d 157, 161 (1987) ("The interpretation of well-defined words and phrases in the common law carries over to statutes dealing with same or similar subject matter.").

---

[20]   We note that any variations from HRS § 246-1 (1967) are minor.

## B.    Wind Turbines Do Not Constitute Real Property

"[I]n the absence of anything to the contrary it is fair to assume that [the legislature] used ["fixture"] in the statute in its common-law sense."  Id. at 27, 731 P.2d at 161 (quoting Gilbert v. United States, 370 U.S. 650, 655 (1962)). "We follow the common law in this jurisdiction."  Smith v. Smith, 56 Haw. 295, 303, 535 P.2d 1109, 1115 (1975).  Thus, until the legislature clarifies how the "use" prong of the fixture analysis should be interpreted, we continue to rely on the common law test set forth in Zangerle to determine whether an object affixed to the land should be considered a fixture.[21]

In Kaheawa, the ICA applied the traditional common law fixture test from Zangerle to hold that wind turbines could not constitute "fixtures" under MCC § 3.48.005 (1980).  See Kaheawa, 135 Hawai'i at 210-11, 347 P.3d at 640-41.  The ICA was correct to rely on this test, which is consistent with the only cases in Hawai'i that have analyzed fixtures.[22]  See Kaheawa, 135 Hawai'i

---

[21]    To the extent that Zangerle's test has not been adopted among all jurisdictions, we note that lack of uniformity in this area of law can be traced to individual state laws defining "fixtures" and "real property."  See, e.g., Marc L. Roark, Groping Along Between Things Real and Things Personal: Defining Fixtures in the Law and Policy in the UCC, 78 U. Cin. L. Rev. 1437 (2010) ("The law of fixtures under the Uniform Commercial Code [] is helplessly tied to the various state laws dictating real estate.").

[22]    Although the Ohio Supreme Court had repudiated its use of the Zangerle fixture test for some time after its publication, Ohio courts, including the Ohio Supreme Court, began recognizing the test again.  Kaheawa, 135 Hawai'i at 641, 347 P.3d at 632 (citing In re Jarvis, 310 B.R. 330, 337-39 (Bankr. N.D. Ohio 2004) and Perez Bar & Grill v. Schneider, 2012 WL 6105324 at *5 (Ohio Ct. App. 2012); see also Funtime, Inc. v. Wilkins, 822 N.E.2d 781, 786 (Ohio 2004); Metamora Elev. Co. v. Fulton Cnty. Bd. Of Revision, 37 N.E.3d
(continued...)

at 210-11, 347 P.3d at 640-41; <u>In re Waipuna Trading Co., Inc.</u>, 41 B.R. 812, 815 (Bankr. D. Haw. 1984); <u>Cartwright</u>, 9 Haw. at 690 (holding that affixed machines in an iron works company were not fixtures, as "the object of their annexation to the ground was in order to keep them steady, and the attachment overhead was for the purpose of communicating steam power to them, both being in order to the more complete enjoyment of the machines as chattels"). Further, we agree with the ICA's application of the <u>Zangerle</u> test and its conclusion that wind turbines are not fixtures.

By statute, property becomes a fixture if (1) it is "necessary to the utility of [the] land" or (2) it cannot be removed "without substantial damage to such land[.]" HRS §§ 231-1 and 248-1. Here, because the parties stipulated that the wind turbines could be removed without damage to the land, the only question is whether they are "necessary to the utility of the land." <u>Kaheawa</u>, 135 Hawai'i at 210-11, 347 P.3d at 640-41.

In making this determination, the court must distinguish between tangible property that is "merely accessory to the business," and property that has been "annexed to the premises as accessory to it, whatever business may be carried on

---

[22](...continued) 1223, 1229 (Ohio 2015)).

Notably, <u>Zangerle</u>'s fixture test was also adopted by statute in Ohio. <u>See</u> Ohio Rev. Code § 5701.02 ("'Fixture' means any item of tangible personal property that has become permanently attached or affixed to the land or to a building, structure, or improvement, and that primarily benefits the realty and not the business, if any, conducted by the occupant on the premises.").

upon it[.]"  Zangerle, 60 N.E.2d at 177; see also Cartwright, 9 Haw. at 691 (distinguishing between "moveable machines, whose number and permanency are contingent upon the varying conditions of the business differ from engines and boilers and other articles secured by masonry and designed to be permanent and indispensable to the enjoyment of the freehold").  In other words, we will only consider property to be a "fixture" under Zangerle if the land to which the alleged fixture is attached cannot be purposefully utilized without its presence.

Applying this test, wind turbines are "only necessary to the utility of the land [] given the particular business that [Appellees are] currently operating.  The wind turbines are not accessory or useful to the land 'whatever business may be carried on upon it.'"  Kaheawa, 135 Hawai'i at 211, 347 P.3d at 641 (quoting Zangerle, 60 N.E.2d at 177).  Accordingly, the wind turbines are not "fixtures," and do not constitute "real property."

We reject the County's claims that the Appellees' wind turbines can be considered "fixtures" under this interpretation of "use," and also reject the County's assertion that it may define what may become assessable accessions to realty pursuant to appraisal concepts of use, utility, and value, because, again, this expanded definition of what constitutes "improvements" would be inconsistent with the common law principles reflected in

38

Zangerle.  See Kaheawa, 135 Hawai'i at 210-11, 347 P.3d at 640-41.

We note that the counties' power to tax real property cannot be construed in isolation, but instead, must be construed with reference to "the current prohibition on the State taxing real property."  City & Cty. of Honolulu v. State, 143 Hawai'i 455, 468, 431 P.3d 1228, 1241 (2018).  Because "only the counties currently possess the constitutional authority to levy a tax on real property within the State of Hawai'i," by re-defining certain personal property as real property, the County prevents the State from exercising its taxing authority over those items.  See id. at 459, 468, 431 P.3d at 1232, 1241 ("[T]he constitution currently allows only the counties to tax real property to the exclusion of all other government entities[.]" (emphasis added)).

As established above, "real property" pursuant to article VIII, section 3 includes affixed machinery or equipment, "whose use is necessary to the utility of the land . . . or whose removal therefrom cannot be accomplished without causing substantial damage to the land[.]"  See, e.g., HRS §§ 231-1 and 248-1.  Because the counties have the exclusive authority to tax these fixtures, the State cannot.  The State can, however, tax all other machinery or equipment if the legislature so decides.

Pursuant to this analysis, wind turbines cannot be construed as "real property" subject to the County's taxation.  In defining a "fixture" to include machinery or equipment that

39

increases the value of the underlying realty, the County would assess the value of virtually any machinery or equipment bolted in place, including wind turbines. In turn, the County would now preclude the State from taxing the same. "The potency of the real property tax as a policy tool . . . is undeniable." Stand. Comm. Rep. No. 42 in 1 Proceedings of the Constitutional Convention of Hawai'i of 1978, at 595 (1980). Unless the legislature provides to the contrary, such policy-making power must be reserved to the State.

## V. CONCLUSION

For the foregoing reasons, we hold that the County exceeded its power under the Hawai'i Constitution when it amended MCC § 6.48.005 to redefine "real property." We therefore affirm the TAC's summary judgment orders and final judgment in favor of the Appellees.

Brian A. Bilberry
for appellant

Ronald I. Heller
for appellee Kaheawa Wind Power

Vito Galati (Christopher T. Goodin with him on the brief)
for appellee Auwahi Wind Energy

Thomas Yamachika
for amicus curiae
Tax Foundation of Hawai'i

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ Michael D. Wilson

